IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| BRANDON GUIDRY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 C 1600 |
| v. | ) | |
| | ) | Hon. Mark Filip |
| CHICAGO POLICE OFFICER RAY | ) | |
| BOYD, STAR NO. 16303 and CHICAGO | ) | |
| POLICE OFFICER M. KASPUT, STAR | ) | |
| NO. 8223, individually and as employee/ | ) | |
| agents of the CITY OF CHICAGO, a | ) | |
| municipal Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
## GRANTING SUMMARY JUDGMENT

Brandon M. Guidry ("Plaintiff" or "Mr. Guidry") sued two Chicago police officers and the City of Chicago (collectively "Defendants") for false arrest in violation of his constitutional rights under 42 U.S.C. § 1983, and for malicious prosecution and assault and battery under Illinois law. Plaintiff also brings an indemnification claim against the City. (*See generally* D.E. 1.[1]) Defendants have moved for summary judgment on all counts. (*See* D.E. 30.) For the reasons stated below, Defendants' motion is granted.

### FACTS

The Court takes the relevant facts from Defendants' Rule 56.1(a)(3) Statement of Uncontested Facts (D.E. 29), Plaintiff's Response to Defendants' Rule 56.1(a)(3) Statement and

---

[1] The designation "D.E." refers to the docket entry number of the cited document.

1

Plaintiff's Statement of Additional Material Facts (D.E. 32), and Defendants' Reply to Plaintiff's Local Rule 56.1(b)(3)(B) Responses and Defendants' Response to Plaintiff's Rule 56.1(b)(3)(C) Statement of Additional Facts (D.E. 35). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Local Rule 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). In this regard, where a party improperly has denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584.

On May 31, 2005, a little before 8:00 p.m., Plaintiff picked up his friend Chris Halford at his grandfather's house on 81st Street and Wolcott in Chicago. (D.E. 29-4 at 11 (Guidry Dep. at 35).) Plaintiff and Mr. Halford then drove about a block to their friend Senque Glass's apartment building on 80th Street, where Mr. Guidry pulled over and put his car in park. (*Id.* at 12 (Guidry Dep. at 38–39).) Meanwhile, Defendant Officers Boyd and Kasput were on patrol nearby in a marked police vehicle, when they received a report of a theft in progress in an alley in the 8000 block of Wolcott. (D.E. 29 ¶¶ 11, 13, 14.) The report described a suspect vehicle involved in the theft as "a newer model silver" vehicle (D.E. 32 ¶ 15) in the "vicinity of 1842 W. 80th Street"

(D.E. 32, Pl.'s SAF ¶ 2).[2] Defendants state that the description of the suspect vehicle also included that it was a four-door sedan with more than one occupant (D.E. 29 ¶ 15), but Plaintiff disputes this fact based on Officer Boyd's allegedly conflicting testimony at a preliminary hearing on criminal charges that arose out of Mr. Guidry's arrest. (D.E. 32 ¶ 15; D.E. 29-8 at 9.) Officer Kasput also testified that the description of the offending vehicle was a Crown Victoria, which he "know[s] from experience is a four-door vehicle," like Plaintiff's Buick Park Avenue.[3] (D.E. 29-7 at 5 (Kasput Dep. at 10, 15).) The Court finds these differences immaterial, but for purposes of summary judgment, the Court construes any ambiguity in Plaintiff's favor.

Defendants responded to the call, and arrived at the scene of the reported theft within minutes. (D.E. 29 ¶ 14.)

---

[2] Plaintiff denies that Defendants knew the "exact location" of the theft in progress. (*See* D.E. 32 ¶ 16; D.E. 29-6 at 26 (Officer Boyd testifying that "I don't know the exact address of the location" but that it was in the vicinity of 1842 West 80th Street); D.E. 29-7 at 5 (Kasput Dep. at 12) (Officer Kasput testifying that the reported location of the theft was "[t]he 8000 block of Wolcott").) This issue, with all respect, is a red herring. Defendants do not allege that they knew "the exact location" of the crime, but instead simply explain that they "were responding to a report of a theft in progress at the 8000 block of Wolcott." (D.E. 29 ¶ 14.) There is some *de minimis* variation in the officers' testimony—in the irrelevant sense that certain descriptions of the area describe the location by reference to the cross street address. The bottom-line though, is that the descriptions of the report of the scene of the crime are all within a block of each other (read most charitably to Plaintiff) and at the very area of Chicago where Plaintiff agrees he was driving with Halford at the time of the arrest. (*See, e.g.*, D.E. 29 ¶ 13; D.E. 32 ¶ 13.)

[3] Plaintiff errs when he suggests that Officer Kasput testified that Plaintiff's car *was* a Crown Victoria, as opposed to a Buick Park Avenue. (*See* D.E. 32, Pl.'s SAF ¶ 8.) Officer Kasput testified that the officers received a description of the offenders' vehicle as a Crown Victoria (*see* D.E. 29-7 at 5 (Kasput Dep. at 10, 15)) , and further stated that Plaintiff and his friend were driving in "a four-door vehicle." (*Id.* at 6 (Kasput Dep. at 15).) In any event, this entire issue is immaterial: the Buick Park Avenue, long one of Buick's flagship sedans (until discontinued as of 2005 in favor of the Buick Electra), looks very much like the Ford Crown Victoria. Both cars are full-sized, four-door American sedans, and they have similar body appearances too. The Court has construed all factual ambiguities in Plaintiff's favor, but this entire "issue" is immaterial to any fair disposition of this case.

Defendants saw Plaintiff's silver 1999 Buick Park Avenue outside Mr. Glass's apartment, and believed that it matched the description of the suspect vehicle in the report. (D.E. 29 ¶ 16.)[4] Defendants initiated a *Terry* stop to investigate whether Mr. Guidry and Mr. Halford were involved in the reported theft. (D.E. 29 ¶ 17; D.E. 32 ¶ 17.)

As they approached Mr. Guidry's car, both officers state that they saw open bottles of Bud Ice beer in the "passenger area" of the car. (D.E. 29 ¶¶ 18, 19.) Defendants each testified they saw the beer bottles in the center console or in the car's cup holders; Plaintiff and Mr. Halford maintain that the two bottles were on the floor in the front passenger area. (*See* D.E. 29-7 at 6 (Kasput Dep. at 17); D.E. 29-6 at 28 (Boyd Testimony at 27), D.E. 29-4 at 31 (Guidry Dep. at 116); D.E. 29-5 at 17–18 (Halford Dep. at 64–65).) Moreover, Plaintiff points out that Officer Boyd testified at the June 7, 2005, preliminary hearing on the criminal charges against Mr. Guidry that he saw Plaintiff drinking from a bottle of beer when he curbed the vehicle (D.E. 32, Pl.'s SAF ¶ 10), but that at the September 1, 2005, suppression hearing in the state case Officer Boyd testified that he observed two open bottles of beer in the cup holders of Plaintiff's car (D.E. 32, Pl.'s SAF ¶ 12). The Court construes the discrepancy in Plaintiff's favor, although this discrepancy is not material, as explained below. Even so, Plaintiff does not deny that there were two open beer bottles in the car, nor does he claim that Defendants could not or did not see them; he argues only that the bottles were empty and that they were not in the exact location of the passenger compartment where Defendants said they were. (D.E. 32 ¶¶ 8, 9, 18, 19.)

---

[4] Plaintiff claims he had already stopped when Defendants pulled up behind him and turned on their flashers (D.E. 29-4 at 12 (Guidry Dep. at 39)); Defendants claim they pulled him over (D.E. 29 ¶ 17) as he was exiting an alley and making a right turn heading eastbound on 80th Street. (D.E. 32, Pl.'s SAF ¶ 5.) Plaintiff denies ever driving through any alley on the date of the incident. (D.E. 32, Pl.'s SAF ¶ 6.) Again, the Court construes the discrepancy in Plaintiff's favor. To be clear, however, nothing material turns on the distinction.

Following the initial stop, the parties diverge somewhat in their telling of the sequence of events. Defendants state that, following the discovery of the two open beer bottles, (1) they saw a twelve-pack of beer ripped open in the back seat of the car, (2) they asked Plaintiff for his license (which, everyone agrees, had expired and therefore was not valid) and proof of insurance (which Plaintiff claims was in the glove compartment but Defendants did not see or could not find), and (3) Defendants placed Plaintiff under arrest—all before they searched his car. (D.E. 29 ¶¶ 20–27; *see also* D.E. 32 ¶¶ 20–27.) Plaintiff claims that Defendants searched the car first and *then* discovered the twelve-pack in the back seat and asked for his license and proof of insurance. (D.E. 32 ¶¶ 20–27.) The gravamen of Plaintiff's version of events appears to be that the arrest and search of the car were rendered illegal by the fact that they took place *before* Defendants asked for Plaintiff's (concededly expired) license and proof of insurance. As discussed below, the Court disagrees on this point as a matter of law—in that the arrest was warranted under Illinois law prohibiting open liquor containers in the passenger area of a car and independently subject to the protections of qualified immunity in any event—but the Court resolves the factual dispute in Plaintiff's favor, as is required on summary judgment. Therefore, the Court takes as true Plaintiff's assertion that he was placed in custody and his car was searched after Defendants saw the two open, empty beer bottles in the passenger compartment of the car, but before the officers asked for Plaintiff's drivers license and insurance.[5]

It is undisputed that Plaintiff was already in custody when Defendants searched the trunk

---

[5] The Court notes, too, that Defendants do not affirmatively or explicitly state that they asked for the license and insurance before placing Plaintiff under arrest and searching his car—which suggests that there may not really be a dispute here or at least reflect that Defendants have crafted their papers in light of applicable summary judgment rules. In any event, the Court would resolve any disputed factual issue in Plaintiff's favor, and the outcome of the case would be the same.

of Plaintiff's car. (D.E. 29 ¶ 27; D.E. 32 ¶ 25.) Under Plaintiff's version of events, Defendants ordered Plaintiff and Mr. Halford out of the vehicle soon after they reached Plaintiff's car, searched them, and required them to empty their pockets. (D.E. 32, Pl.'s SAF ¶ 17.) After searching the two men, Defendants placed Mr. Guidry under arrest. (D.E. 29 ¶ 31.) Plaintiff states that Defendants handcuffed the two men together. (D.E. 32, Pl.'s SAF ¶ 18.) Defendants state that they handcuffed Mr. Guidry and placed him in their patrol car. (D.E. 29 ¶ 31.) This difference is immaterial, but the Court construes the facts as Plaintiff has presented them and assumes Mr. Guidry was handcuffed to Mr. Halford.

Plaintiff testified that the cuffs were "kind of" tight. (D.E. 29 ¶ 32.) Plaintiff testified that he believed he told the officers that the handcuffs were tight, that he thought he asked once that they be loosened, and that the officers responded that he would be "out of them in a minute." (D.E. 29 ¶ 33.) The handcuffs in fact were then removed when Plaintiff arrived at the police station. (D.E. 29 ¶ 34.) Plaintiff did not complain to a supervisor about the handcuffs being too tight on the date of the incident and did not request medical attention. (D.E. 29 ¶ 35.) Plaintiff said he thought he "had a couple bruises from the handcuffs" that lasted for a few days. (D.E. 29 ¶ 32.) Plaintiff admits that he did not find any of the physical contact to be offensive. (D.E. 29 ¶ 36; D.E. 32 ¶ 36.)

It is undisputed that Plaintiff was previously convicted of a felony as an accessory to burglary. (*See, e.g.*, D.E. 29-4 at 6 (Guidry Dep. at 15) (Plaintiff testifying that he received probation in 1997 following his conviction as an accessory to a burglary).) It is further undisputed that, following Plaintiff's arrest, Defendants searched the trunk of Plaintiff's car and found an old handgun in the tire well of the trunk. (D.E. 29 ¶ 28; D.E. 32, Pl.'s SAF ¶ 20.) According to Plaintiff, the gun, a revolver, was old, and Defendants had trouble opening it. (D.E.

32, Pl.'s SAF ¶¶ 20–22.[6]) Defendants determined that the gun was unloaded, but never determined whether it was operational. (D.E. 32, Pl.'s SAF ¶¶ 21, 25.) Plaintiff asserts that he did not know the gun was in the trunk, and further asserts without dispute that the car was not his but instead belonged to a family member. (D.E. 32, Pl.'s SAF ¶ 28; D.E. 35 at 16.) Plaintiff did not have a Firearm Owner Identification Card. (D.E. 29 ¶ 29.[7]) Defendants found no lawn furniture in Plaintiff's car. (D.E. 32, Pl.'s Add. Facts ¶ 16.) Officer Boyd drove Plaintiff's car to the police station, where it was impounded. (D.E. 29 ¶ 30.)

Plaintiff was charged upon his arrest with aggravated unlawful use of a weapon, 720 ILCS 5/24-1.6(a); transportation or possession of open alcoholic liquor in a motor vehicle, 625 ILCS 5/11-502; driving without a valid drivers license, 625 ILCS 5/6-101; operating a motor vehicle without insurance, 625 ILCS 5/3-707; possession of a firearm without a Firearm Owners Identification (FOID) Card, 430 ILCS 65/2(a); and failure to register the firearm, a violation of Chicago Municipal Code Section 8-20-040. (D.E. 29 ¶ 37.) At the preliminary hearing on June 7, 2005, the Cook County Circuit Court found probable cause to arrest Plaintiff. (D.E. 29 ¶ 38.) The State voluntarily dismissed the traffic offenses and the ordinance violation, and proceeded on the gun charge. (*Id.*) On June 14, 2005, the State charged Plaintiff by information with one

---

[6] For some reason, Plaintiff repeatedly interjects that the handgun was "rusty." (*E.g.*, D.E. 32, Pl.'s SAF ¶¶ 20-23.) This issue of whether the .32 caliber handgun was "rusty" is a red herring: both the State of Illinois and federal government have prohibited possession of firearms by convicted felons, and/or unlicensed possession of firearms, without regard to whether the guns are "rusty" or sub-standard, on the one hand, or pristine and shiny, on the other. In this regard, it bears mention that a rusty or sub-standard weapon is often more dangerous than a normal gun, in that a responsible person can safely fire a well-maintained gun (assuming he lawfully can possess it), while a rusty or broken weapon may not shoot properly, regardless of the level of care shown by its user. In any event, this entire issue of whether the handgun in the trunk was "rusty" or not is immaterial to the appropriate resolution of this case under the law.

[7] As a convicted felon, Plaintiff, of course, could not receive a FOID card.

count of unlawful use of a weapon by a felon, 720 ILCS 5/24-1.1, and two counts of aggravated unlawful use of a weapon, under 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) and 720 ILCS 5/24-1.6(a)(2), (a)(3)(C). (D.E. 29 ¶ 39.) On September 1, 2005, the state court granted Plaintiff's motion to quash arrest and suppress evidence on finding that the officers lacked reasonable articulable suspicion to stop the car, and the State dismissed the charges listed in the information. (D.E. 29 ¶ 40.) Before the Court is Defendants' motion for summary judgment. (*See* D.E. 29.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley*, 359 F.3d at 928. To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In this regard, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, and of particular relevance in this

case—because Plaintiff tends to dwell on putative factual ambiguities concerning immaterial factual questions (*e.g.*, whether the gun was "rusty," whether Plaintiff was handcuffed alone or to his friend at the scene)—factual disputes must concern *material* issues bearing on the resolution of the case. *See, e.g., id.* at 247–48 (teaching that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact") (emphases in Supreme Court original).

## DISCUSSION

Plaintiff advances four claims in his operative complaint: (1) Count One, a Section 1983 claim alleging false arrest/unlawful detention; (2) Count Two, a state law malicious prosecution claim; (3) Count Three, a state law assault and battery claim; and Count Four, a state law indemnification claim. (D.E. 29-2.) Pursuant to 28 U.S.C. § 1331, the Court has original jurisdiction over Plaintiff's false arrest claim, which arises under 42 U.S.C. § 1983. In addition, pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Plaintiff's state law claims because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . ." *Id.*; *accord, e.g., Jinks v. Richland County, South Carolina*, 538 U.S. 456, 458 (2003) (discussing 28 U.S.C. § 1367(a)).

## I. False Arrest Claim

Plaintiff alleges that Defendants lacked probable cause for his arrest, and therefore violated his Fourth Amendment right to be free from unreasonable seizures. (*See* D.E. 29-2 ¶ 14.) Defendants argue that summary judgment is warranted because they did have probable cause to arrest Plaintiff. (D.E. 30 at 4, 8.) Defendants also argue that they are entitled to qualified immunity. (*Id.* at 9.) As explained below, the Court finds that Defendants had a lawful

basis to arrest Plaintiff for his undisputed transportation of open alcohol containers in his car. Defendants also are independently entitled to summary judgment on this Count on grounds of qualified immunity.

Precedent teaches that "[p]olice officers are entitled to qualified immunity for actions taken during a stop or arrest insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) (internal quotation marks and citations omitted). In determining whether an officer is entitled to qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *accord, e.g., Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). If no constitutional right has been violated, that is the end of the qualified immunity analysis. *See Saucier*, 533 U.S. at 201. As explained below, this is the threshold basis on which Defendants are entitled to summary judgment on Count One: their arrest of Plaintiff was justified under Illinois law prohibiting the transport of open alcohol container(s) in automobiles.

Precedent further teaches that, if a violation could be made out on the facts taken in the light most favorable to the plaintiff, the next step "is to ask whether the right was clearly established," namely "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The Supreme Court has instructed that it is "vital" that "[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Moreover, "[o]nce a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right." *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997) (citation

omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Id.* (internal quotation marks and citation omitted). In assessing qualified immunity in the context of summary judgment, the Seventh Circuit teaches that the nonmovant's version of disputed facts must be taken as true. *See, e.g., Payne*, 337 F.3d at 775 (collecting cases); *Morfin v. City of East Chicago*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003). Precedent also makes clear that "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers." *Payne*, 337 F.3d at 776 (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *accord, e.g., Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.") (citing *Malley*, 475 U.S. at 344–45); *Malley*, 475 U.S. at 341 ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

In this case, Defendants move for summary judgment based on the existence of probable cause to arrest Plaintiff. Precedent establishes that probable cause constitutes an "absolute bar" to false arrest claims, even if the charges are later dismissed. *See, e.g., Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause.") (citing *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995)); *accord, e.g., Morfin*, 349 F.3d at 997 ("It is well-settled that the actual existence of probable cause to arrest precludes a § 1983 suit for false arrest") (collecting cases; internal quotation marks and citation omitted); *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1113 (7th Cir. 1997) (collecting cases). The Seventh Circuit further teaches that "[p]robable cause . . . does not

require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (citation omitted). Instead, "[s]o long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *Id.* (collecting cases); *accord United States v. Sawyer*, 224 F.3d 675, 678–79 (7th Cir. 2000) (citation omitted). As the Supreme Court has explained in reviewing its probable cause jurisprudence, "[o]n many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citations and internal quotation marks omitted); *see also United States v. Muhammad*, 120 F.3d 688, 696 (7th Cir. 1997) ("This flexible, commonsense probable cause standard rests on whether a man of reasonable caution would believe that the accused has committed a crime; it does not require that this belief be correct or more likely true than false.") (internal quotation marks and citation omitted); *Booker v. Ward*, 94 F.3d 1052, 1057–58 (7th Cir. 1996) (teaching that a court should evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer . . . .") (internal quotation marks, citation, and emphasis omitted).

Defendants argue, *inter alia*, that there was probable cause to arrest Mr. Guidry for transporting at least one open (albeit just-finished-while-driving) bottle of beer in the passenger area of his car. Applying Illinois law concerning the transportation of open alcohol containers in the passenger areas of cars, the Court agrees.

### A. Reasonable Suspicion for Investigatory Stop

Plaintiff advances no count in his Complaint complaining of his initial stop by the Defendant officers. Nonetheless, in the interests of completeness, the Court notes that Defendants had reasonable suspicion to stop Plaintiff based on the dispatch report of a theft in the area, as well as a general description of the suspect vehicle that, reading the record in the most-crabbed and Plaintiff friendly fashion that is possible, still comported in at least general terms with the description of Plaintiff's car. Under the law, and as explained below, this is a sufficient basis for a simple *Terry* stop of a vehicle in the area of a crime.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. "Reasonable suspicion" must be based on "some objective manifestation" that the suspect was or is involved in criminal activity. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) (internal quotation marks and citation omitted); *accord, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). Police may not detain a suspect based merely on "a hunch"; however, the likelihood of criminal activity need not rise to the level required for probable cause and falls "considerably short . . . [of the] preponderance of the evidence standard." *Id.*, 534 U.S. at 274 (citation omitted); *see also United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (holding that reasonable suspicion requires "some minimal level of objective justification for making a stop"). In evaluating the reasonableness *vel non* of a *Terry* stop, courts must examine the totality of the circumstances known to the officer at the time of the stop. *See, e.g.*, *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002).

Plaintiff's vehicle—a silver 1999 Buick Park Avenue—matched the description of the vehicle in the report Defendants received, which was of a silver, newer model car. (D.E. 32 ¶

15.) Plaintiff was also in the immediate vicinity of the alleged theft—the 8000 block of Wolcott—within minutes of when Defendants received the report of the theft. (D.E. 32, Pl.'s SAF ¶ 2; *see also* D.E. 29 ¶ 14.) This is sufficient to create reasonable suspicion and it therefore justified a simple *Terry* stop. *Accord, e.g., Tilmon*, 19 F.3d at 1225 (holding that, notwithstanding that two hours had passed since robbery and car was spotted 50 miles from location of the crime, police had reasonable suspicion based on fact that described and stopped cars were both blue Mustangs with gray or silver stripe and Minnesota license plates); *Creighton v. Anderson*, 922 F.2d 443, 448 450 (8th Cir. 1990) ("The description of the getaway car (maroon or burgundy over silver, possibly a Buick) corresponded closely enough with the description of the Creightons' car (red or burgundy Oldsmobile) to create a strong suspicion that they might be the same car.") (citation omitted). Extensive federal appellate authority makes clear that the requisite "non-hunch" basis to justify a *Terry* stop of an automobile—a basis materially lower, of course, than probable cause—is a relatively undemanding one and confirms the propriety of the *Terry* stop here. *See, e.g., United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (affirming the propriety of a *Terry* stop where description of suspect vehicle was of "a Ford Thunderbird containing two persons" and the vehicle stopped was "a Mercury Cougar containing three persons at the time of the stop"); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813–14 (6th Cir. 1999) (affirming the propriety of a *Terry* stop where there was no description of the suspect vehicle at all, and only a generalized estimate of where the car might be in relation to traffic and other vehicles, which estimate actually was misunderstood by the officer who effected the stop of plaintiffs' vehicle); *United States v. Juvenile TK*, 134 F.3d 899, 900 (8th Cir. 1998) (affirming the propriety of a *Terry* stop where the suspect car was described as a "gray car" and the gray car that was stopped was two blocks from the scene of the robbery

within five minutes of the second dispatch concerning the crime, notwithstanding that the officers did not know the make, model or year of the suspect car, had no description of the driver, and the stopped car did nothing illegal prior to the *Terry* stop); *see also Houston*, 174 F.3d at 813 (teaching that "reasonable suspicion [for purposes of a *Terry* stop] can arise from evidence that is less reliable than what might be required to show probable cause") (collecting cases); *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003) (finding reasonable suspicion to stop a purple Ford Explorer with shiny rims based on a report of a shooting fifteen minutes earlier and eight blocks away, with a suspect vehicle described as a burgundy or maroon Ford Explorer with shiny rims).

Plaintiff argues that discrepancies between his version of events and Defendants' version create a material issue of fact requiring denial of summary judgment. The Court respectfully disagrees. Plaintiff's chief argument in this regard is that the description of the suspect vehicle given in the dispatch report did not match Plaintiff's vehicle (and, secondarily, that Defendants gave "conflicting" testimony regarding the description in the report). Even crediting Plaintiff's version of the report description—a newer model, silver vehicle in the 8000 block of Wolcott—Plaintiff's vehicle and location is close enough to merit an investigatory stop, as confirmed by the federal appellate caselaw cited above. Moreover, the suggestion that Defendants' testimony was conflicting is misplaced—the testimony about the dispatch does not necessarily conflict, and even if it did, the Court has credited Plaintiff's version of the facts. Officer Boyd variously recounted the report as describing a car with "[o]ccupants, more than one occupant, newer model, silver vehicle" (D.E. 29-6 at 25), and as just a "newer model, silver

vehicle" (D.E. 29-8 at 9.)[8]  Officer Kasput also testified that Plaintiff's vehicle was a Ford Crown

Victoria (as opposed to a Buick Park Avenue, which is what Plaintiff actually was driving).

(D.E. 32, Pl.'s SAF ¶ 8.)  The Court finds these differences immaterial (for example, a Ford

Crown Victoria is a similar car to the Buick Park Avenue under any fair view of things); again,

however, for purposes of summary judgment, the Court construes any ambiguity in Plaintiff's

favor.  Plaintiff also argues that whereas Defendants testified they first saw Plaintiff's vehicle

exiting an alley, Plaintiff and his passenger, Mr. Halford, maintain they were parked in front of

their friend's apartment building when Defendants pulled up behind them and turned on their

flashers.  (*Compare* D.E. 29 ¶ 17 and D.E. 32, Pl.'s SAF ¶ 5 *with* D.E. 29-4 at 12 (Guidry Dep. at

39).)  Again, the Court finds this discrepancy immaterial—either way Plaintiff and his friend

were in the immediate area of the reported theft.  The Court finds that Plaintiff's car and location

at the time of the theft, based on Plaintiff's version of events, sufficiently matched the description

given in the report to create reasonable suspicion, and therefore justified an investigatory stop.

---

[8]  Plaintiff at times appears to make something of the fact that the suspect vehicle from the theft in progress report was a "newer model" vehicle, and Plaintiff was driving (as of 2005, the year of the arrest) a 1999 car.  This alleged "factual issue" is immaterial.  First, the description "newer model" is a relative term: a "newer model" car to the residents of Beverley Hills, California might be, as Plaintiff suggests, a car that is only two, or three, or four years old; however, in a more typical, working- or middle-class neighborhood in Chicago, a "newer" car certainly can include one that is five or six years old.  In addition, and independently, the police department gets descriptions of vehicles from a wide variety of citizens, and few of them are experts on makes, models and years of cars in a way that sensibly permits razor-sharp distinctions to be drawn on the basis of the general age of a reported suspect car.  In this regard, the Court notes that when Plaintiff's friend and passenger at the time of the arrest, Christopher Halford, was deposed, he stated that Plaintiff's car was "anywhere from like '99, 2001. Something like that." (D.E. 29-5 at 15 (Halford Dep. at 56).)  If Mr. Halford, Plaintiff's friend, did not know whether Plaintiff's vehicle was a 1999 model or 2001 model (and the Court does not suggest that he should be expected to know such a matter with that level of precision), one cannot remove the Defendant officers from the scope of qualified immunity protection because they thought a 1999 vehicle might be described by a citizen as a "newer model" car in 2005.

In any event, a putative claim based on the *Terry* stop would, like the false arrest claim actually raised, independently fall under qualified immunity analysis. *See, e.g., Payne*, 337 F.3d at 776 (teaching that, "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers.") (quoting *Malley*, 475 U.S. at 343); *Anderson*, 483 U.S. at 641 ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.") (citing *Malley*, 475 U.S. at 344–45); *Malley*, 475 U.S. at 341 ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). The standard for a *Terry* stop is a relatively undemanding one—a "hunch" is not enough, but probable cause is not necessary. Defendants' conduct in making the stop fits well within the parameters concerning the scope of qualified immunity under any view of the facts, as reflected by the caselaw cited above. There is no suggestion that the Defendants stopped Plaintiff for illicit, or racist, or bigoted reasons; indeed, Plaintiff admits that the officers "pulled over the Plaintiff to investigate whether or not Plaintiff's car was involved in the theft." (D.E. 29 ¶ 17; D.E. 32 ¶ 17.) The *Terry* stop was reasonable and justified, and, as explained further below, once the officers saw the open alcohol container in the automobile passenger area, they were entitled to follow up by arresting Plaintiff, the driver of the vehicle. The arrest thus was lawful—even putting aside the additional undisputed facts that Plaintiff was transporting a handgun (to be sure, in his view, unwittingly) at the time of his arrest, that he was a convicted felon when the handgun was recovered, and that he

had no valid driver's license at the time of the stop either.[9]

### B.    Probable Cause for Arrest

Preliminary issues aside, the threshold question in this case in terms of Plaintiff's actual claims is whether a reasonable officer would have believed that Plaintiff had transported or possessed alcohol in an open container so as to justify his arrest. The relevant Illinois statute states that no driver or passenger "may transport, carry, possess or have any alcoholic liquor within the passenger area of any motor vehicle upon a highway in this State except in the original container and with the seal unbroken." 625 ILCS 5/11-502(a), (b). Though the Illinois courts have not addressed the empty-bottle question frequently, it is relatively clear that the presence of an empty bottle of beer or liquor in the passenger area of a car is sufficient to create probable cause for arrest under the statute. *See People v. Miller*, 791 N.E.2d 1145, 1148 (Ill. App. Ct. 2003) (finding insufficient evidence for *conviction* where empty beer can was found near defendant's car and there was no evidence that it was the same brand of beer found inside the car in a closed can, but suggesting that the evidence would have been sufficient to convict if the empty, open can had been found inside the car); *People v. Gray*, 420 N.E.2d 856, 859 (Ill. App. Ct. 1981) ("The officer testified that he observed two open beer bottles that smelled of alcohol. Although the officer did not testify that liquid remained in the bottles, he was not asked if it did. Since the only issue is probable cause and not ultimate conviction, this testimony was clearly sufficient to support a finding of probable cause at the hearing on the motion to suppress evidence."); *accord People v. Zeller*, 367 N.E.2d 488, 491 (Ill. App. Ct. 1977) (holding that there

---

[9] *See, e.g.*, D.E. 29-6 at 13 (Halford testimony that police recovered handgun from Plaintiff's car); D.E. 29-4 at 6 (Guidry Dep. at 15–16) (Plaintiff's testimony regarding his accessory to burglary conviction).

was probable cause to arrest a rear passenger in a car where the police officer observed a can of beer and a puddle in the front part of the car, but the officer did not detect the odor of alcohol and found no beer in the rear of the car, because "the test of probable cause for arrest is not whether the officer reasonably believes there is a likelihood of ultimate conviction"); *id.* ("Given the presen[ce] of three cans of liquor, two of which were open, in the immediate vicinity of the car, we have no doubt that . . . [the officer] had probable cause to arrest defendant and his companions even if such evidence could not have resulted in a conviction").

After Defendants stopped Plaintiff, and walked up to the side of his car, it is undisputed that they saw two open bottles of beer in the passenger compartment. Frankly, Plaintiff's own witness at times seems to testify as though he had open alcohol in the car—*i.e.*, that he had a bottle with some beer still in it while the two men were stopped by the police. *See, e.g.*, D.E. 29-6 at 20–21 (Halford testimony) ("Q. Okay. And at the time that the police came up to the defendant's car, there was an open bottle of Bud Ice in that car, wasn't there? A. Yes.").[10] In addition, Plaintiff himself admitted at his deposition that he drove in the immediate area where he was stopped while Mr. Halford was consuming open alcohol, which is, not surprisingly, a crime in Illinois. *See* D.E. 29-4 at 31 (Guidry Dep. at 115) ("Q. Okay. And as far going back to the bottle of beer that Chris Halford had when he entered the car, how long after he entered the car did he finish whatever was left in that bottle? A. Before we got to the next, middle of the block, the next block, he was done.").

Notwithstanding this testimony by Plaintiff, Plaintiff seemingly takes the position that,

---

[10] Although the Court does not credit such testimony for purposes of summary judgment analysis, in the interests of completeness, the officers, of course, contend that there actually was open liquor in the car. *See, e.g.*, D.E. 29-6 at 34 ("Q. And there was beer in these bottles according to you? A. Yes, sir.").

for purposes of summary judgment, the Court should assume that the open beer bottles in the passenger compartment were empty. The Court will do so, but it makes no difference. Even assuming that a bottle was empty on the floor of the front passenger compartment, its presence was sufficient to create probable cause to arrest Plaintiff for violating the Illinois statute prohibiting "transportation or possession of alcoholic liquor in a motor vehicle . . . except in the original container and with the seal unbroken." 625 ILCS 5/11-502. The presence of an open empty alcohol container in the passenger area of a car would make a reasonable police officer believe that a suspect had been transporting alcohol in an open container. (Indeed, even under Plaintiff's own testimony, that is what actually did occur.) Not surprisingly, this was one of the explicit bases for Plaintiff's arrest. (D.E. 29 ¶ 37.)

Plaintiff admits that there were two empty beer bottles in the passenger area when Defendants approached the car, and the remainder of a twelve pack in the back seat. (D.E. 32 ¶¶ 8–10.) The state court judge found probable cause for the arrest at Plaintiff's preliminary hearing. (D.E. 29 ¶ 38.) The States Attorney's Office ultimately dismissed the open-alcohol charge, as well as the other traffic offenses and the ordinance violation, and proceeded only on the felony gun charge (*i.e.*, UUW/possession of a handgun by a convicted felon). (D.E. 29 ¶ 38.) However, this Court independently finds that Defendants had, at a minimum, probable cause to arrest Plaintiff based on the presence of the open, empty alcohol containers in the passenger compartment of the car, and that the arrest was therefore valid, even though the open-alcohol charge was later voluntarily dismissed. *Accord, e.g., Kelley*, 149 F.3d at 646; *Jones by Jones*, 45 F.3d at 181.

Plaintiff does not address, much less attempt to distinguish, the Illinois case law on transporting open containers of alcohol, other than to cite *People v. Nadermann*, 723 N.E.2d 857

(Ill. App. Ct. 2000), which unsurprisingly held that transporting a ripped cardboard box containing *sealed* bottles of beer was not a violation of the statute. With all respect, *Nadermann* is inapposite. The Illinois courts have distinguished between carrying a ripped cardboard outer box of sealed beer bottles, *Nadermann*, and carrying one or more open bottles of beer or liquor in a passenger compartment, *Miller*, *Gray*. The latter, which is what was present in the instant case, creates probable cause, and therefore warrants arrest for violating the statute. *See Miller*, 791 N.E.2d at 1148; *Gray*, 420 N.E.2d at 859. The former, which is not the situation in the instant case, does not. *See Nadermann*, 723 N.E.2d at 862.

Instead of focusing on this issue, Plaintiff merely asserts, without citation, that if a bottle is empty, then carrying it in a car does not violate the statute. (D.E. 33 at 7.) Plaintiff then moves on to discuss immaterial discrepancies regarding where in the passenger area of the car the (allegedly) empty bottles were located. (*See id.*) But this assertion ignores Plaintiff's own testimony acknowledging that he *was* transporting his buddy, Mr. Halford, while Halford was drinking and finishing off the beer. That is, quite simply, illegal under Illinois law. Moreover, when the relevant inquiry is simply whether there was probable cause to arrest—a much lower standard than proof-beyond-a-reasonable-doubt—there is no requirement in law or logic that the officer must actually witness the drinking-while-driving misconduct to arrest the driver for a violation of the Illinois open alcohol container prohibition. That is the case because one may be able to infer, based on the facts and circumstances in the case, that it was reasonably likely that such drinking-while-driving was occurring so as to ground a probable cause conclusion; the propriety of such an inference is especially apt in this case, where Plaintiff *expressly admits* that such drinking-while-driving was occurring in the moments before he and Mr. Halford were stopped. *See* D.E. 29-4 at 31 (Guidry Dep. at 115) ("Q. Okay. And as far going back to the

bottle of beer that Chris Halford had when he entered the car, how long after he entered the car did he finish whatever was left in that bottle? A. Before we got to the next, middle of the block, the next block, he was done."); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (police may effect a full custodial arrest for even minor traffic-related offenses).

Plaintiff concludes his argument regarding lack of probable cause by leaving the issue of the empty beer bottles and asserting that the arrest was illegal because he was arrested, and the car was searched, before Defendants asked him for his license and proof of insurance. In other words, Plaintiff argues that his lack of license and insurance were the only "hooks" that could have created probable cause for arrest; because the arrest allegedly took place before Defendants asked for the license and insurance information, the arrest was illegal. (D.E. 33 at 9.) As discussed above, even if the arrest took place before Defendants asked for Plaintiff's license and insurance, it was supported by probable cause based on the empty bottles Plaintiff admits were in the passenger area of the car. *See, e.g., Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (probable cause to arrest for any offense bars Section 1983 false arrest claim).

Plaintiff does not directly challenge the search of the car as unlawful (there is no enumerated count in Plaintiff's Complaint for an unlawful search, and Plaintiff has only tangentially briefed the issue), but, in the interest of completeness, the Court adds that probable cause to arrest in this case also validates the search of the car. Under the automobile exception to the search warrant requirement, a law enforcement officer need not have a warrant to search a vehicle when "there is probable cause to believe that the search will uncover contraband or evidence of crime." *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005)); *see also Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (per curiam) (holding that there need not be an exigency for the automobile exception to apply). As with probable cause for arrest, "determining

whether probable cause [to search] exists involves a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993) (internal quotation marks and citation omitted). A reasonable officer could have concluded, based on the report of the theft in the area and the subsequent discovery of open, empty alcohol bottles in Plaintiff's car, that there was a fair probability that evidence of a crime would be found elsewhere in the car. *See United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) ("[P]resence of contraband in passenger compartment is probable cause to search entire vehicle, including trunk, for additional contraband.") (citing *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir.1992)); *see also McGuire*, 957 F.2d at 314 (possession of open alcohol in car justified search of trunk, in which cocaine was then found) (collecting cases).[11]

Even if Plaintiff's claim for false arrest were not otherwise barred, it would fail because Defendants have qualified immunity. As stated, precedent establishes that when a defendant

---

[11] Moreover, and independently, the search also was justified as an inventory search relating to the impounding of the vehicle. Plaintiff concedes that he was not driving on a valid license at the time of his arrest. (D.E. 29 ¶ 22; D.E. 32 ¶ 22.) Plaintiff's friend and passenger, Mr. Halford, also testified that he had no drivers' license at the time of Plaintiff's arrest. (*See* D.E. 29-6 at 22.) The police therefore took custody of the vehicle and needed to impound it. "Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (collecting cases); *see also United States v. Jensen*, 169 F.3d 1044, 1048 (7th Cir. 1999) (stating that "[w]arrantless inventory searches of cars in police custody are also proper as long as the police lawfully have custody of the vehicles") (citation omitted). Here, Plaintiff admits to having open empty bottles in the car, as well as to not having a valid license. Defendants therefore properly towed his vehicle, and an inventory search is lawful under such circumstances—both to protect the vehicle owner's property and to protect the Defendants and City of Chicago from claims that an arrestee's property was lost or stolen. (*Accord* D.E. 29 ¶ 30; D.E. 32 ¶ 30 (agreement that vehicle was impounded following Plaintiff's arrest); D.E. 29-7 at 11 (Kasput Dep. at 34) (vehicle impounded after Plaintiff's arrest); D.E. 29-6 at 29. Qualified immunity also independently would apply. *Accord, e.g., Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

asserts qualified immunity, the burden is on the plaintiff to show why the defense fails. *See, e.g.*, *Estate of Stevens*, 105 F.3d at 1174 ("Once a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right.") (citation omitted). As also stated, because of the nature of qualified immunity review, "the doctrine of qualified immunity leaves 'ample room for mistaken judgments' by police officers." *Payne*, 337 F.3d at 776 (quoting *Malley*, 475 U.S. at 343); *see also Malley*, 475 U.S. at 341 (teaching that the qualified immunity doctrine protects "all but the plainly incompetent or those who knowingly violate the law"). Under the analytical metric established by the caselaw, a court must "ask whether the right was clearly established"—that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201–02. This analysis cannot be taken at an abstract, meta-level of generality, but rather "must be undertaken in light of the specific context of the case" at issue. *Id.* at 201.

Plaintiff argues that Defendants are not entitled to qualified immunity because there are "material facts in dispute." (D.E. 33 at 14.) However, as discussed above, the facts Plaintiff claims are disputed are not material to the outcome of the case. In other words, even construing all the facts in Plaintiff's favor—*e.g.*, assuming Plaintiff was parked in front of his friend's apartment building, instead of exiting an alley; crediting Plaintiff's assertion that the beer bottles found in his car were empty and located on the floor of the front passenger area; and assuming that the officers did not confirm that Plaintiff did not have a valid drivers license or was a felon transporting a .32 caliber handgun until he already had been taken into custody—Defendants still could have reasonably believed they had probable cause to arrest under the Illinois prohibition against transporting open alcohol containers. In this regard, the Court notes that Plaintiff offers no legal authority suggesting that the Illinois open-liquor prohibition has been interpreted in a

manner that would clearly reflect the putative unlawfulness of the arrest effected. To the contrary, the caselaw discussed above supports the propriety of the arrest, which certainly cannot undermine the applicability of qualified immunity. *See, e.g., Apostol v. Landau*, 957 F.2d 339, 342 (7th Cir. 1992) (teaching that, if the undisputed facts, read in the light most favorable to the nonmovant, "indicate that the defendants' conduct did not violate any clearly established legal standard, the defendants are entitled to qualified immunity as a matter of law") (citation omitted); *accord Saucier*, 533 U.S. at 201.

Plaintiff makes a similar argument with respect to why, in his estimation, Defendants should not receive immunity under the Illinois Tort Immunity Act, 745 ILCS 10/2-202. (*See* D.E. 33 at 15 (citing *Glover v. City of Chicago*, 436 N.E.2d 623 (Ill. App. Ct. 1982)).) As already discussed, there are no material facts in dispute, and qualified immunity therefore cannot be withheld on this basis. The existence of probable cause to arrest also precludes the conclusion that Defendants' conduct was "willful and wanton," as would be necessary to deprive Defendants immunity under the Illinois Tort Immunity Act, which is relevant to the state claims discussed below. *Accord, e.g., Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006).[12]

---

[12] Plaintiff's final argument against granting summary judgment is that Defendants should be collaterally estopped from challenging the state court's determination in Plaintiff's suppression hearing that Defendants lacked probable cause to stop Plaintiff. (*See* D.E. 33 at 16; D.E. 29-6 at 41.) This argument is unpersuasive in light of Seventh Circuit precedent. *See, e.g., Kraushaar v. Flanigan*, 45 F.3d 1040, 1050–51 (7th Cir. 1995) (collecting precedent and rejecting argument that the State's failure to establish probable cause in criminal proceeding estops individual officers from presenting their own probable cause defense in carry-on Section 1983 suit); *Kunzelman v. Thompson*, 799 F.2d 1172, 1178 (7th Cir. 1986) (collateral estoppel not appropriate because defendant-officers in Section 1983 civil case were not in sufficient privity with state in initial criminal proceeding, and because application of collateral estoppel would raise substantial due process concerns regarding rights of defendant-officers in the Section 1983 suit); *Williams v. Kobel*, 789 F.2d 463, 470 (7th Cir. 1986) (no collateral estoppel against arresting officers because officers were not afforded a full and fair opportunity to present probable cause case in criminal proceeding being litigated by assistant state's attorney). In this

In sum, based on the arguments presented by Plaintiff and the allegations he advances, a reasonable officer could have believed Plaintiff had committed the offense of transporting or possessing an open bottle of alcohol in his car. Therefore, Defendants were acting lawfully in arresting Plaintiff. Moreover, and independently, the officers were not acting contrary to clearly established law when they arrested Plaintiff, and therefore they would be entitled to qualified immunity in any event. Therefore, Defendants' decision to arrest Plaintiff "'falls within the zone of probable cause [ ]and even more easily into the zone of qualified immunity[ ].'" *Kelley*, 149 F.3d at 648 (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247–48 (7th Cir. 1994)). Summary judgment on this claim is therefore appropriate. *Accord, e.g.*, *Kelley*, 149 F.3d at 648; *Sheik-Abdi*, 37 F.3d at 1247–48.

## II.    Malicious Prosecution Claim

The Court next addresses Plaintiff's pendent state claim for malicious prosecution.[13]

---

case, as in the precedents cited above, the State itself was the party to the original criminal action, not the Defendant officers. The state's attorney brought the charges and did not even call both Defendants as witnesses in the case; only Officer Boyd testified. (*See* D.E. 34 at 11.) The Defendant officers did not control the presentation of the probable cause argument. Plaintiff did not testify either, nor could the Defendant officers have required him to do so. (*Id.*) The Court finds that Defendants in this case, like those in *Kunzelman*, *Kobel*, and *Kraushaar*, did not have the requisite privity to the prior proceeding. Moreover, as the Seventh Circuit has taught, applying the doctrine of collateral estoppel to them would be unfair and would compromise their due process rights. *Accord, e.g.*, *Kraushaar*, 45 F.3d at 1051 (reviewing Seventh Circuit precedent).

[13] As already discussed, 28 U.S.C. § 1367(a) authorizes a federal court to exercise supplemental jurisdiction over state law claims, but it does not mandate that the court exercise such jurisdiction, either initially or as a case progresses. *See* 28 U.S.C. § 1367(a); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Instead, § 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction" where, *inter alia*, the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). However, this general rule is subject to "three well-recognized exceptions." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). These exceptions comprise "unusual cases in which the balance of factors to be considered under the pendent jurisdiction

Illinois precedent teaches that "malicious prosecution" is a disfavored cause of action under Illinois law. *See, e.g., Ross*, 861 N.E.2d at 319 ("Illinois does not favor a suit for malicious prosecution due to the public policy interest in the exposure of crime.") (citing *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006)). "Persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of unfounded suits by those accused." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 840 (Ill. App. Ct. 2000) (collecting cases). That said, to establish a claim of malicious prosecution, a plaintiff must show (1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice on defendants' part, and (5) damages resulting to plaintiff. *Ross*, 861 N.E.2d at 319 (citing *Reynolds*, 850 N.E.2d at 837).

Illinois courts have defined "probable cause" with respect to malicious prosecution involving criminal proceedings as "a state of facts that would lead a person of ordinary caution

---

doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits." *Id.* at 1251. Those three categories are (1) where the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) where substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; and (3) where it is clearcut how the pendent claims should be decided, as would be the case where the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, or where the state-law claims are clear losers. *See id.; see also, e.g., Rothman v. Emory Univ.*, 123 F.3d 446, 454 (7th Cir. 1997) (emphasizing that considerations of judicial economy counsel that jurisdiction be retained when the appropriate disposition of the state claim is clear); *accord Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993) ("[I]f the correct disposition of a pendent claim or action was so clear as a matter of state law that it could be determined without further trial proceedings and without entanglement with any difficult issues of state law, considerations of judicial economy warranted retention and decision rather than relinquishment of the case to the state court.") (citations omitted). Here, at a minimum, the outcome of the state law claims is clear and considerations of judicial economy counsel in favor of retaining the state claims.

and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (Ill. App. Ct. 2003) (collecting cases; internal quotation marks and citations omitted). "There is no need to verify the veracity of each item of information obtained; one need only act with reasonable prudence and caution in proceeding." *Ross*, 861 N.E.2d at 320 (citing *Johnson*, 791 N.E.2d at 1219).[14] "'[T]he existence of probable cause [also] precludes the common law actions of false arrest and imprisonment and malicious prosecution.'" *Taylor v. Bush*, No. 04 C 3396, 2006 WL 862855, at *3 (N.D. Ill. March 30, 2006) (quoting *Carlson v. Bell*, No. 04 C 8201, 2005 WL 3116051, at *3 (N.D. Ill. Nov. 22, 2005)). Put differently, "the failure to prove a lack of probable cause is fatal to a claim for malicious prosecution." *Johnson*, 791 N.E.2d at 1219 (collecting cases).

Plaintiff's only argument against summary judgment on the malicious prosecution claim is that there are material issues of fact regarding whether Defendants had probable cause to arrest him. (D.E. 33 at 15–16.) As discussed above, the Court finds that the "fact issues" identified by Plaintiff are not material, and even construing all disputes in Plaintiff's favor, summary judgment would be warranted. In that regard, the Court has determined that the officers had probable cause to arrest Plaintiff. There is no argument or suggestion in the record that any intervening event occurred between the officers' arrest of Plaintiff for the traffic offense and the filing of the charge against Plaintiff that would have contradicted their probable cause finding. The officers' probable cause to arrest Plaintiff proves fatal to his pendent state claim of malicious prosecution,

---

[14] "Moreover, a mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (Ill. App. Ct. 2003) (citation omitted).

under the authority cited above.

**III.    Assault and Battery**

Defendants have also demonstrated their entitlement to summary judgment on the

Plaintiff's assault and battery claim. "An assault is an intentional act meant to cause a reasonable

apprehension of an imminent battery." *Ewing v. Budget Rent-A-Car Sys., Inc.*, No. 92 C 1714,

1993 WL 28738, at *2 (N.D. Ill. Feb. 4, 1993) (Kocoras, J.) (citation omitted).  To make out a

claim of battery under Illinois law, a plaintiff is required to prove that the defendant

"'intentionally or knowingly without legal justification and by any means, (1) cause[d] bodily

harm to an individual or (2) ma[de] physical contact of an insulting or provoking nature with an

individual.'" *Smith*, 242 F.3d at 744 (quoting 720 ILCS 5/12-3(a)).  The Illinois Tort Immunity

Act "entitles local government employees to immunity from tort liability in the 'execution or

enforcement of any law' unless their conduct is 'willful and wanton.'" *Carter v. Chicago Police

Officers*, 165 F.3d 1071, 1080 (7th Cir. 1998) (quoting 745 ILCS 10/2-202); *see also* 3 Ill. L. and

Prac. Assault, Battery & Bodily Harm, § 2 (2005) ("The gist of the action for assault and battery

is malice, which implies a wrong inflicted on another with evil intent or purpose.").

First, Plaintiff has not produced any evidence or even a suggestion that Defendants

intended to cause him harm. Second, Plaintiff admits that the only physical contact he had with

Defendants was when they handcuffed him and placed him in the patrol car, and he further

admits that he did not even find Defendants' physical contact offensive. (D.E. 29 ¶ 36; D.E. 32 ¶

36; *see also* D.E. 29-4 at 21 (Guidry Dep. at 74).) It is undisputed in this case that, "[i]n the

course of the arrest, the only physical contact between the officers and the Plaintiff was the

placement of handcuffs on the Plaintiff and some incidental contact when Plaintiff was placed in

the police vehicle." (D.E. 29 ¶ 31; D.E. 32 ¶ 31.) Under both federal and Illinois law, police

officers are permitted to use the amount of force necessary to effectuate an arrest, and here that force was about as minimal as one could possibly imagine. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[An arrest] necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Nor is there any allegation that the officers struck Plaintiff or even threatened or suggested that they might do so. Instead, Plaintiff only suggests that "he believed he told the officers transporting him that the handcuffs were tight, that he thought he asked that they be loosened, and that he received a response that he would be 'out of them in a minute.'" D.E. 29 ¶ 33; D.E. 32 ¶ 33.); *see also* D.E. 29 ¶ 32; D.E. 32 ¶ 32 (undisputed that Plaintiff merely testified that "the cuffs be kind of tight" [sic]). Plaintiff further acknowledges that he did not persist in any request to have the handcuffs loosened, and further admits that the officers indeed did, upon arrival at the police station, remove the handcuffs as the officers stated they would. (D.E. 29 ¶¶ 33–34; D.E. 32 ¶¶ 33–34.) Plaintiff did not request any medical attention, did not complain to any supervisor, and even under his own account, says only that he had "a couple bruises" that "lasted for a few days." (D.E. 29 ¶ 32; D.E. 32 ¶ 32.) Plaintiff admits that "he did not find any of the physical contact to be offensive." (D.E. 29 ¶ 36; D.E. 32 ¶ 36.)

Under such circumstances, even crediting all facts and inferences in Plaintiff's favor, there is no triable case about whether Plaintiff can recover money damages for assault and battery as evaluated under the standards in the Illinois Local Governmental and Governmental Employees Tort Immunity Act, which requires a finding of willful and wanton misconduct by a public officer before money damages can be awarded. *See, e.g.*, *Smith*, 242 F.3d at 744 (affirming grant of summary judgment against battery claim relating to plaintiff's handcuffing, and stating that "[a] public employee is immune from liability while enforcing the law unless

their acts are willful and wanton.") (citing 745 ILCS 10/2-202); *accord Chelios v. Heavener*, No. 06 C 909, 2006 WL 3147717, at *5 (N.D. Ill. Oct. 31, 2006) (granting summary judgment for defendants on an assault and battery claim where defendant officers used only the force necessary to effect arrest). Plaintiff has presented no evidence to show that the force or threat of force involved in his arrest was anything more than that which was minimally necessary to place him in secure custody in the back of the police car. And while, under materially different factual allegations, a triable assault and battery claim might be adduced relating to a handcuffing, in this case, there is no basis by which a jury could find willful and wanton misconduct by the transporting officers. Even crediting all inferences in Plaintiffs favor, the record simply establishes that the handcuffs were a bit tight, Plaintiff complained once about them and then was silent after he was told they would soon be removed, and they were then removed when the group arrived at the station. No medical treatment was requested or received. There is no basis by which a reasonable factfinder could find willful and wanton misconduct; indeed, it would be hard to find even simple negligence here.

## IV.    Indemnification Claim

Finally, because Plaintiff's other claims fail, Plaintiff's claim for indemnification by the City also must fail, as there is nothing against which the City need indemnify Defendants.

**CONCLUSION**

For the reasons stated, Defendants' motion for summary judgment is granted.

Mark Filip
United States District Judge
Northern District of Illinois

Date: 7/17/07